**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | **Criminal Action No. 2015-0018** |
| ) | |
| **DAMIAN LANG, SR.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
    *For the United States*

**Pamela L. Colon, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant*

<u>**MEMORANDUM OPINION**</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Damian Lang, Sr.'s ("Defendant") "Motion to Dismiss for *Brady* and *Giglio* Violations" ("Motion" or "*Brady* Motion") (Dkt. No. 177); the Government's Response to Defendant's Motion ("Response") (Dkt. No. 188); Defendant's Reply in Support of his Motion ("Reply") (Dkt. No. 205); and the parties supplemental memoranda (Dkt. Nos. 211, 214) filed in response to the Court's Order (Dkt. No. 208). The Court held an evidentiary hearing on Defendant's *Brady* Motion on November 10 and 11, 2018, and the parties submitted supplemental briefs following the hearing. (Dkt. Nos. 236, 239). For the reasons set forth below, the Court will grant Defendant's *Brady* Motion and will dismiss the indictment in this case with prejudice.

# I.    BACKGROUND

On May 26, 2015, a grand jury returned an indictment charging Defendant with one count of conspiracy to commit an offense against the United States—to wit, bank robbery—in violation of 18 U.S.C. § 371 and one count of bank robbery in violation of 18 U.S.C. § 2113(a). (Dkt. No. 1). The charges stem from a robbery of the Bank of St. Croix that occurred on September 2, 2014. Following trial, the jury returned a verdict of guilty on both the conspiracy and the bank robbery counts. Defendant then filed the instant Motion, arguing that the indictment should be dismissed, or, alternatively, that he should be granted a new trial, because the Government failed to comply with its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory evidence to Defendant. Specifically, Defendant asserts that the Government failed to disclose evidence suggesting that Troy Nisbett ("Nisbett") and his associates, Karime Williams ("Williams") and Kareem Gordon ("Gordon"), were responsible for the robbery of the Bank of St. Croix on September 2, 2014. (Dkt. No. 177 at 2-4).

The Drug Enforcement Administration ("DEA") Reports of Investigation ("DEA 6s") attached as exhibits to Defendant's Motion establish that law enforcement arrested Nisbett, Williams, and Gordon on September 4, 2014—two days after the bank robbery—in connection with an assault that occurred on September 3, 2014. (Dkt. No. 177-1 at 9). At the time of the arrest, Nisbett had $1,800 in cash in his possession. (Dkt. No. 177-2 at 2). Law enforcement executed a search warrant on a hotel room at the Palms at Pelican Cove on September 4, 2014 and discovered cocaine. (Dkt. No. 177-1 at 8). Nisbett later acknowledged that he had stayed in the hotel room. (Dkt. No. 177-2 at 2).[1] Law enforcement also obtained a video from Nisbett's cellphone showing

---

[1] Nisbett eventually pleaded guilty to a charge of possession of cocaine with intent to distribute in *United States v. Troy Nisbett*, CRIM. ACTION NO. 2017-0021.

a handgun in the same hotel room in which officers found the cocaine. *Id.* Nisbett was charged in a criminal complaint filed on October 8, 2014 in MAGISTRATE NO. 2014-0032 with unlawful possession of a Glock semi-automatic pistol on or about August 27, 2014—five days before the bank robbery. (Dkt. No. 205 at at 5). The criminal complaint was later dismissed on a motion filed by Assistant United States Attorney ("AUSA") Alphonso Andrews, Jr.—the lead prosecutor at Defendant's trial.

As reflected in a DEA 6 dated September 16, 2014, DEA Special Agent Tracey Gardner— together with Federal Bureau of Investigation ("FBI") Special Agents Thomas Calhoun and Scott Holtz—interviewed Shakerah Boyce ("Boyce") and Jose Osorio, Jr. ("Osorio") on September 10, 2014. (Dkt. No. 177-1 at 11). Boyce and Osorio were the victims of the September 3, 2014 assault for which Nisbett was arrested. *Id.* During the interview, Boyce stated that Williams, who is her cousin, had accused her of stealing cocaine—an accusation which Boyce denied. *Id.* at 11-12. Boyce further stated that Williams was the individual who had assaulted her while Gordon and Nisbett served as lookouts. *Id.* at 12. As it relates to this case, the report also states:

> Boyce told agents she had heard Gordon came to St. Croix to rob a bank. She said Gordon is the brains behind the robbery of the Bank of St. Croix while Williams and Nisbett were the ones who executed the robbery. Boyce indicated she had also heard Williams and Nisbett were "dealing dope" and that she had given money to Williams to buy marijuana for her on numerous occasions. Boyce and Osorio Jr both indicated they heard Williams and Nisbett had been "robbing and stealing from people." *Agents note: The VIPD and FBI are currently investigating the potential connection between Gordon, Nisbett, and Williams and the robbery of the Bank of St. Croix on September 2, 2014.*

*Id.* at 13 (emphasis in original).

A second DEA 6 dated November 4, 2014 states that agents from DEA and FBI, as well as AUSA Andrews, attended a proffer session on October 31, 2014 with Nisbett and his then-defense attorney Michael Joseph, Esq. (Dkt. No. 177-2 at 1). During the proffer session, Nisbett informed

AUSA Andrews and the law enforcement agents that a friend—whose name Nisbett refused to reveal on the advice of counsel—was trafficking large amounts of cocaine through St. Croix. *Id.* at 1-3. Nisbett stated that he was assisting his friend in trafficking the cocaine, and offered details regarding the activities of the cocaine trafficking operation. *Id.* Nisbett told law enforcement that he could call his friend, but that they would not discuss drug trafficking over the phone. *Id.* at 3. He stated that, if he were released from detention, he would be able to arrange a meeting with the friend. *Id.* When asked about the robbery at the Bank of St. Croix, Nisbett stated that "the police were after him for a bank robbery, but he was not a part of that." *Id.* The report continues: "*Agents note, based on all the information revealed during this interview, it is likely* [Nisbett's friend] *is Priority Target, Jose Hodge.*" *Id.*

Neither of the DEA 6s suggesting possible links between Nisbett and his associates and the robbery of the Bank of St. Croix were disclosed to Defendant in response to his counsel's request for the production of *Brady* material. (Dkt. No. 177 at 4).[2] Defendant argues that, had it been disclosed, this evidence would have permitted him to advance a defense theory at trial that the bank robbery was in fact committed by Nisbett, Williams, and Gordon, and not by Defendant. *Id.* at 11. He asserts that this theory would have been compelling given that Defendant was not identified by any eyewitness; Defendant and Nisbett share similar physical characteristics; the DEA 6s reveal that Nisbett had access to firearms; the Glock semi-automatic pistol pictured in Nisbett's hotel room is consistent with the firearm used during the bank robbery; no one was ever arrested as Defendant's accomplice in the bank robbery; Nisbett was in possession of $1,800 in

---

[2] Counsel for Defendant states that she received the DEA 6s on May 2, 2017—nearly 11 months after Defendant's trial had concluded—from an attorney representing a defendant in *United States v. Quinones-Davila, et al.*, CRIM. ACTION NO. 2016-0009. (Dkt. No. 177 at 4). The defendants in that case included Jose Hodge, the priority target mentioned in the agent's note in the November 4, 2014 DEA 6.

cash when he was arrested two days after the robbery; and Boyce could potentially have served as a defense witness offering testimony that Nisbett and his associates were responsible for the robbery. (Dkt. Nos. 177 at 7, 10-11, 205 at 8).

Defendant also argues that this theory would have been bolstered by evidence that "Nisbett became an extremely valuable investigative human resource to AUSA Andrews" in the investigation of a large-scale drug trafficking organization. (Dkt. No. 177 at 4-5). He contends that—had he been able to present evidence before the jury that DEA and AUSA Andrews considered the prosecution of the drug trafficking organization to be a priority objective and viewed Nisbett as a valuable resource in that prosecution—the evidence in his case would have been viewed in a different light. *Id.* at 7. Specifically, Defendant argues that he would have been able to put forward a case that the Government was concerned that the prosecution of Nisbett for the Bank of St. Croix robbery would "make it difficult to use him strategically and tactically in the [drug trafficking] investigation, especially if Nisbett remained in jail." *Id.* at 6. In support of this argument, Defendant points to Nisbett's DEA Confidential Source Establishment Report, which states:

> In November, 2014 the CS [Troy Nisbett], offered valuable information regarding high ranking targets . . . and agreed to infiltrate the [drug trafficking organization] if he was able to get bond. Since the AUSA could not obtain bond, without divulging the use of the CS, AUSA Andrews dismissed the federal charges against the CS on December 15, 2014.

(Dkt. No. 205-11 at 2).[3] In short, Defendant argues that, if the information suggesting a possible connection between Nisbett and the bank robbery had been timely disclosed, he could have

---

[3] Nisbett's DEA Confidential Source Establishment Report was not produced to Defendant by the Government. Like the DEA 6s discussed above, it was provided to Defendant's counsel by a defense attorney participating in the *Quinones-Davila* trial.

presented his theory to the jury that "he had been made a scapegoat to cover for AUSA Andrew's untouchable source." (Dkt. No. 177 at 12).

In addition to his argument that the Government's failure to disclose exculpatory evidence constituted a *Brady* violation, Defendant contends that the record evidence demonstrates that the violation was intentional. Defendant posits that AUSA Andrews—motivated by his desire to keep Nisbett's name out of a "messy bank robbery investigation . . . [that] would tarnish Nesbitt [*sic*] as a resource"—intentionally suppressed the DEA 6s indicating that Nisbett was under investigation by law enforcement as a potential suspect in the Bank of St. Croix robbery. *Id.* at 5-6, 13. He therefore requests that the Court dismiss the indictment with prejudice as the remedy for AUSA Andrews' alleged deliberate misconduct. *Id.*

In its Response, the Government asserts that FBI agents interviewed Boyce in October 2014, and that during the interview she made no mention of the Bank of St. Croix robbery. (Dkt. No. 188 at 3). Pointing to an FBI report bearing an October 3, 2014 date of entry attached as an exhibit to the Government's Response, the Government contends that DEA Special Agent Gardner—the author of the September 16, 2014 DEA 6—was not present during the FBI interview. *Id.* The Government concedes the substance of the DEA 6 reflecting Boyce's statement that Nisbett, Williams, and Gordon were responsible for the bank robbery. It argues, however, that "the information found in the DEA report is clearly based on a rumor that Boyce heard and that she has no first-hand knowledge to support this information." *Id.*

As to the $1,800 found on Nisbett's person at the time of his arrest, the Government asserts that because Nisbett had a "large amount of currency" on his person at the time of his arrest and because "the arrest occurred shortly after the robbery of [the] Bank of St. Croix, VIPD ran the serial numbers of the bills . . . . [and] were [*sic*] able to confirm that none of the numbers found on

Nisbett's person matched the numbers of the bills that were taken from the Bank of St. Croix during the robbery." *Id.* at 2. The Government claims that, as a result, Nisbett was ruled out as a suspect in the Bank of St. Croix robbery, and that "any future activity in Nisbett's case ha[d] no relevance to the robbery" investigation. *Id.* The Government also contends that there was "overwhelming evidence" of Defendant's guilt presented at trial, pointing specifically to evidence in the form of global positioning system ("GPS") maps that allegedly placed Defendant in and around the Bank of St. Croix at the time of the robbery based on location information reported by an electronic ankle bracelet worn by Defendant. *Id.* at 7.

In his Reply, Defendant notes that the DEA 6 summarizing the September 10, 2014, interview with Boyce states that "*[t]he VIPD and FBI are currently investigating the potential connection between GORDON, NISBETT, and WILLIAMS and the robbery of the Bank of St. Croix on September 2, 2014.*" (Dkt. No 205 at 1-2). Defendant argues that—contrary to the Government's assertion—FBI Special Agents Calhoun and Holtz interviewed Boyce on September 10, 2014 together with DEA Special Agent Gardner. *Id.* at 4-5. He argues that the DEA 6 and the FBI report summarize the same interview with Boyce and are substantially similar, except that the FBI report omits information tying Nisbett to the bank robbery. *Id.* at 5-6. Defendant posits that this information was intentionally omitted from the FBI report because at the time that report was entered—October 3, 2014—the Government had already determined that it wanted to use Nisbett as an informant and witness in the drug trafficking investigation and prosecution. *Id.*

Defendant also contests the Government's assertion that Boyce's statement tying Nisbett to the bank robbery is based on rumor. *Id.* at 2. Defendant notes that while Boyce states that "she had heard" that Gordon came to St. Croix to rob a bank, she does not similarly qualify the

subsequent sentence: "Gordon is the brains behind the robbery of the Bank of St. Croix while Williams and Nisbett were the ones who executed the robbery." *Id.*

With regard to the money discovered in Nisbett's possession when he was arrested, Defendant alleges that after Nisbett was arrested, he gave the cash to his brother, VIPD Officer Jeffrey Nisbett ("Officer Nisbett"). *Id.* at 3.[4] Defendant asserts that Officer Nisbett did not turn over the cash to VIPD until the following day, September 5, 2014—thus raising a question as to whether the bills that Officer Nisbett provided to VIPD were the same bills he received from Nisbett the previous day. *Id.* Defendant also claims that AUSA Andrews was informed by VIPD Captain Dino Herbert that an investigation had been opened by VIPD regarding Officer Nisbett's handling of the money he received from his brother. *Id.*[5]

In light of the evidence that Defendant uncovered after his trial in this matter, Defendant contends:

> Even assuming that the only thing Mr. Lang's trial counsel did was introduce this evidence, without any additional investigation based upon all that was learned, the jury would have been presented with a complete theory, consistent with Mr. Lang's innocence, of who the robber was and why he was not prosecuted. Indeed, defense counsel's closing argument in defense of Mr. Lang would sound like a prosecution argument for Troy N[i]sb[e]tt's conviction of the bank robbery. Clearly, individually, and certainly collectively, this information was material to Mr. Lang's defense.

*Id.* at 9-10.

---

[4] The Court will refer to Officer Jeffrey Nisbett as "Officer Nisbett" throughout this Opinion to distinguish him from his brother—Troy Nisbett.

[5] As discussed further below, Captain Herbert confirmed during the evidentiary hearing held on November 10, 2018 that he had opened an investigation into Officer Nisbett's handling of the money in Nisbett's possession at the time of his arrest, and that he had informed AUSA Andrews about this investigation.

## II.     DISCUSSION

### A.     Applicable Legal Principles

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]" *Id*. at 87. As the Third Circuit has noted:

> To prove a *Brady* violation, a defendant must show that the evidence at issue meets three critical elements. First, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching." [*Strickler v. Greene*, 527 U.S. 263, 281-84 (1999)]. Second, it "must have been suppressed by the State, either willfully or inadvertently." [*Id.* at 282]. Third, the evidence must have been material such that prejudice resulted from its suppression. *Id.*

*Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 284-85 (3d Cir. 2016) (internal citations omitted). In *Kyles v. Whitley*, 514 U.S. 419, 419 (1995), the Supreme Court explained that the "touchstone of materiality is a 'reasonable probability' of a different result . . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434. In other words, courts examine whether "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

While "[t]he materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state," *Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) (quoting *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010)), materiality for *Brady* purposes "is not a sufficiency of evidence test." *Kyles*, 514 U.S. at 434. "The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict." *Id.* at 435. Instead, a *Brady* violation is established through a showing that "the favorable evidence

could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*

"To comply with *Brady*, prosecutors must 'learn of any favorable evidence known to the others acting on the government's behalf [], including the police.'" *Dennis*, 834 F.3d at 284 (quoting *Strickler*, 527 U.S. at 281). However, "[t]he purpose of *Brady* is not to require the prosecution to disclose all possibly favorable evidence to the defense but to make certain that the defendant will not be denied access to evidence which would ensure him a fair trial." *Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009). The burden of establishing a *Brady* violation falls on the defendant. *Maynard v. Gov't of the V.I.*, 392 F. App'x 105, 119 (3d Cir. 2010) (citing *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005)).

Ordinarily, the most severe remedy for a *Brady* violation is a retrial. *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 252 (3d Cir. 2005). Under exceptional circumstances, however, dismissal of an indictment may be appropriate. *Id.* ("While the [Supreme] Court has assumed that *Brady* violations that have affected the judgment of a jury normally will be remedied by a new trial, it has left open the possibility of barring retrial in response to particularly egregious due process violations.") (citations omitted). This rare sanction is "potentially available in cases [where a *Brady* violation was the product] of deliberate misconduct by the government which resulted in substantial prejudice to the defendant." *United States v. Jafari*, 2012 WL 5335242, at *2 (D.N.J. Oct. 26, 2012), *aff'd*, 648 F. App'x 226 (3d Cir. 2016) (emphasis omitted) (citing *Fahie*, 419 F.3d at 254-55); *see also United States v. Kubini*, 19 F. Supp. 3d 579, 626 (W.D. Pa. 2014) ("[D]ismissal of an indictment may only be ordered in narrow circumstances and upon a finding of willful prosecutorial misconduct which violates the Due Process clause and causes prejudice to the defendant.") (citations omitted).

B.      **Analysis**

1.      ***Brady* Violation**

The Court begins with an examination of the first two elements of a *Brady* violation—that (1) the evidence was favorable to the accused and (2) the evidence was suppressed—and easily concludes that they are satisfied here. In its Response to Defendant's Motion, the Government focuses nearly exclusively on the materiality of the evidence. Other than a conclusory and meritless assertion at the end of its Response that information related to the investigation into Nisbett's potential connection to the bank robbery is not exculpatory (Dkt. No. 188 at 8), the Government does not address the first two *Brady* elements.

That the Government did not meaningfully address the first two *Brady* elements is not surprising. Boyce's statement as reflected in the September 16, 2014 DEA 6 indicating that Nisbett, Williams, and Gordon were allegedly responsible for the Bank of St. Croix robbery is plainly exculpatory as to Defendant, as it suggests that individuals other than Defendant were responsible for the crime. In addition, there is no assertion in the Government's Response that it was unaware of the exculpatory evidence or that the evidence was actually disclosed to Defendant.[6]  The evidence was therefore suppressed. *Dennis*, 834 F.3d at 292 ("Only when the government is aware that the defense counsel already has the material in its possession should it be held to not have 'suppressed' it in not turning it over to the defense."). Thus, the evidence tying Nisbett and his associates to the Bank of St. Croix robbery meets the first two elements required to establish a *Brady* violation. *See id.* at 306 ("It is undisputed that the first two elements of *Brady* are met. The Frazier documents indicated that someone other than Dennis committed the crime,

---

[6] AUSA Andrews acknowledges in an affidavit presented by the Government as an exhibit during the evidentiary hearing in this matter that he was made aware of Boyce's statement "[a]t some point after the interview [with law enforcement], but in 2014[.]" (Evid. Hr'g. Gov't Ex. 10 at ¶ 6).

and were thus exculpatory, and there is no question that the state did not disclose the documents until [after trial].").[7]

The Court thus turns to the third *Brady* element—whether the evidence was material. As noted above, the "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles*, 514 U.S. at 434. Accordingly, the Court must examine the effect of the suppressed evidence in the context of the evidence produced at trial to determine whether in its absence Defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* As the Third Circuit has noted:

> Suppressed evidence that would be cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for *Brady* purposes. Conversely, however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration.

*Johnson*, 705 F.3d at 129 (citation omitted).

In this regard, the Government argues that there was "overwhelming evidence" of Defendant's guilt presented at trial. The Government introduced evidence showing that—as a result of his house arrest—Defendant was required to wear an ankle bracelet equipped with GPS tracking technology that monitored his movements. While on house arrest, Defendant was allowed to leave his residence Monday through Friday from 10:00 a.m. to noon in order to seek employment. (*See* Dkt. No. 136 at 4). Defendant was also required to pay $70 per week for the cost of his electronic monitoring equipment. *See id.* at 3.

---

[7] The Government's assertion that Boyce's interview with FBI and DEA occurred on different days is irrelevant for purposes of the *Brady* analysis. Even if the Government were able to establish that FBI and DEA interviewed Boyce separately—a finding which, as discussed below, the evidence does not support—this fact would have no bearing on the Government's obligation to disclose material exculpatory evidence to Defendant.

The Government also presented evidence that, at approximately 10:30 a.m. on the day of the robbery, security cameras outside the Bank of St. Croix showed a gray Chevrolet Equinox circling the parking lot. The Equinox stopped in front of the bank, and two masked individuals ran out of the vehicle and into the bank. Once inside the bank, one of the robbers remained by the door, brandished a gun, and yelled for everyone to get down. The other masked robber jumped over the counter and stole money from the tills. Both robbers then ran back to the Equinox and drove off heading east. The Equinox was later found abandoned in a nearby parking lot.

The Government introduced GPS maps in support of its contention that Defendant was in and around the Bank of St. Croix at the time of the robbery. The GPS maps allegedly indicate the times that Defendant was present in a particular location, and closely match the times recorded on video surveillance showing the Chevy Equinox circling the parking lot, parking in front of the Bank of St. Croix, and then departing east. The Government also contends that an object consistent with an ankle bracelet can be seen on security footage of the robber jumping over the counter inside the Bank of St. Croix. Eyewitness testimony from individuals inside the bank during the robbery describe the robber with the gun as being taller—around six-feet—and the robber who jumped over the counter as being shorter—around five feet, five inches—and stocky. There was also witness testimony that, although the robbers wore masks and their faces could not be seen, the shorter robber had a light complexion. Further, there is evidence that around 1:00 p.m. on the day of the robbery, Defendant went to Superior Court to pay his ankle bracelet monitoring fee. He usually paid the minimum of $70; however, on this occasion he paid $1,200. The GPS maps allegedly indicate that Defendant was at Superior Court around the time that he made the $1,200 payment.

During closing argument, Defendant's trial counsel attacked several alleged weaknesses in the Government's case. She noted that no eyewitness had placed Defendant at or near the bank at the time of the robbery. She also pointed out that while law enforcement officers found DNA evidence in the Equinox, they presented no evidence that the DNA was a match to Defendant.

Defendant's trial counsel also questioned the authenticity of the GPS maps allegedly placing Defendant at the Bank of St. Croix at the time of the robbery. Jeffrey Keith from B.I. Technologies ("B.I.")—the company that markets and provides technical assistance for the ankle bracelet Defendant was wearing—testified that information contained in the GPS maps the Government introduced came from the B.I. system. (Dkt. No. 171 at 67-68, 176-77). He also stated, however, that he had not personally created three maps allegedly reflecting Defendant's movements during the time the bank robbery occurred, which were introduced at trial as Government Exhibits 5B, 5C, and 5D—although he had checked the contents of those maps against the B.I. system for accuracy. *Id.* at 135-46. Keith was unable to explain the origin of the date and time stamps on the top of those three maps, and testified that the date and time stamps were not generated by the B.I. program and appeared to be typed onto the documents. *Id.* at 136-37. Defendant's trial counsel argued that Keith was therefore unable to guarantee that all of the GPS maps on which the Government relied were B.I. maps, and used Keith's testimony to argue that someone had added the dates and times across the top of the maps contained in those exhibits.

Defendant's trial counsel also pointed to testimony from VIPD Detective Moses President, one of the investigating detectives in the case, that he had borrowed a GPS tracking device after the robbery in order to "test the accuracy of the bracelet." (Dkt. No. 173 at 78-79). Detective President stated that he drove around with the GPS bracelet so that he could go back later and see if the tracking was accurate. *Id.* In her closing argument, Defendant's trial counsel suggested that

this testimony might explain the origins of the date and time stamps on the GPS maps as introduced by the Government—namely, the placement of the date and time of the bank robbery on the maps by Detective President reflecting a route that he, not Defendant, actually traveled.

In sum, the key issue in the case was the identity of the bank robbers. Because no eyewitness could identify Defendant or place him at the bank, and because the Government presented no evidence tying Defendant to the abandoned getaway car, the Government's case relied heavily on the GPS tracking evidence.

It is in this context that the Court finds that the suppressed evidence regarding Nisbett's alleged connection to the bank robbery is material. At trial, Defendant argued that the Government did not have strong evidence corroborating the GPS maps and suggested that the maps had been altered.[8] As Defendant argues in his Reply, had the suppressed evidence regarding Nisbett's alleged connection to the robbery been disclosed, defense counsel would have been able to pursue and present the jury with a "complete ['other person'] theory, consistent with Mr. Lang's innocence, of who the robber was and why he was not prosecuted." (Dkt. No. 205 at 9-10). In other words, presenting the jury with the suppressed evidence would not only have provided the jury with an alternative theory for who committed the robbery, but also could have breathed life into Defendant's attack on the authenticity of the GPS maps—the linchpin of the Government's case.

---

[8] The Court acknowledges that there is arguably some corroboration of the GPS tracking evidence. That evidence is supported by the physical description of the shorter robber; the object underneath the robber's pants that is arguably consistent with an ankle bracelet; the fact that the robbery occurred during a period of time in which Defendant was permitted to be away from his residence per the terms of his house arrest; and the evidence that Defendant made a larger than usual payment to the Superior Court a few hours after the robbery. However, when viewed in the context of the totality of the evidence and the arguments advanced, it is clear that the Government's case hinges on the GPS tracking evidence and that this critical evidence was challenged by Defendant.

In reaching this conclusion regarding the materiality of the suppressed evidence, the Court finds the case of *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016), to be instructive. In an *en banc* decision, the Third Circuit in *Dennis* granted habeas relief to James Dennis—who was challenging his conviction for the murder of Chedell Williams—finding that the Pennsylvania Supreme Court's denial of a *Brady* claim was an unreasonable application of, and contrary to, clearly established federal law. *Id.* at 269. According to the facts of *Dennis*, on October 22, 1991, Williams and her friend Zahra Howard were walking together near a transit station when two men approached and demanded the girls' earrings. *Id.* The girls ran, and the men followed Williams. *Id.* After catching up with Williams, the men took her earrings, shot her, and then fled to a nearby getaway car. *Id.* The police were unable to locate either the firearm or the earrings, but three eyewitnesses—one of whom was Williams' friend Howard—testified that Dennis was the shooter. *Id.* at 271. Dennis was convicted of first-degree murder. *Id.* at 269.

After trial, it was revealed that the prosecution had failed to disclose to Dennis, *inter alia*, documents regarding a tip from an inmate detailing his conversation with another man who had identified himself as Williams' killer. *Id.* at 275. The inmate stated that he and his aunt, Angela Frazier, participated in a three-way call with Tony Brown in which Brown told them that he shot a girl near the transit station after he had stolen her earrings. *Id.* at 305. According to the inmate, Brown confessed to the murder and informed the inmate that a man called Skeet and the inmate's cousin, Ricky Walker, participated in the murder. *Id.* The police later interviewed Walker, who denied knowing Brown and Skeet, denied any knowledge or involvement in the murder, and stated that he was with his mother on the day of the murder. *Id.* at 305-06. The police did not investigate Walker's alibi. *Id.* at 306.

In granting Dennis habeas relief, the Third Circuit ruled that the Pennsylvania Supreme Court's rationale that the tip from the inmate was a "fruitless lead" and that the information was inadmissible was an unreasonable application of, and contrary to, clearly established law regarding *Brady* material. *Id.* In particular, the Third Circuit noted that "[t]here is no requirement that leads be fruitful to trigger disclosure under *Brady*, and it cannot be that if the Commonwealth fails to pursue a lead, or deems it fruitless, that it is absolved of its responsibility to turn over to defense counsel *Brady* material." *Id.* The Third Circuit found that, "[a]rmed with the [information regarding the inmate's tip], Dennis's counsel would have been prepared to pursue the lead himself or at least informed the jury of the police's misguided focus on Dennis and failure to pursue the lead." *Id.* at 306. As for the Pennsylvania Supreme Court's conclusion that the information in the tip was inadmissible, the Third Circuit noted that "evidence is material under *Brady* when the defense could have used it to 'attack the reliability of the investigation.'" *Id.* at 308 (quoting *Kyles*, 514 U.S. at 446). The Third Circuit reasoned as follows:

> The proper inquiry for the Pennsylvania Supreme Court was to consider whether disclosure of the [information regarding the tip] would have impacted the course of trial, which includes investigative activities. Here, disclosure of the [information regarding the tip] would have empowered defense counsel to pursue strategies and preparations he was otherwise unequipped to pursue.

*Id.* The Third Circuit ultimately held that the information regarding the tip was material because it would have allowed Dennis to both challenge the government's investigation of the murder and to present an "other person" defense. *Id.* at 311. In so ruling, the Third Circuit stated:

> Alterations in defense preparation and cross-examination at trial are precisely the types of qualities that make evidence material under *Brady*. Consequently, it was unreasonable for the Pennsylvania Supreme Court to conclude that the [information regarding the tip was] not material. There is a reasonable probability that had the jury heard an "other person" defense, the result of the proceeding would have been different.

*Id.*

Here, as in *Dennis*, the suppressed evidence would have allowed Defendant to "pursue strategies and preparations he was otherwise unequipped to pursue" in that he could have sought to challenge the Government's investigation and present an "other person" defense. Had it been disclosed to him, Defendant could have utilized information that Boyce had identified Nisbett and Williams as the perpetrators of the bank robbery in developing an "other person" defense. This evidence alone, therefore, would have impacted Defendant's investigative activities and thus the course of the trial. *See Dennis*, 834 F.3d at 308.

Additionally, had the information regarding Boyce's statement been disclosed, Defendant's investigation may have resulted in the discovery of Nisbett's arrest; information that Nisbett had access to a gun during the same time period as the bank robbery and was found with large amounts of cash when he was arrested two days after the bank robbery; the filing of a criminal complaint against Nisbett; and the subsequent dismissal of the complaint and the attendant circumstances—which would in turn have permitted Defendant to advance an attack on the thoroughness of the Government's investigation into the robbery. Defendant could have advanced an argument that the Government did not want Nisbett to be incarcerated in order to facilitate his work with the Government—as evidenced by the Confidential Source Establishment report stating that AUSA Andrews dismissed federal charges against Nisbett on December 15, 2014 in order that he could be released to infiltrate the drug trafficking organization. (Dkt. No. 205-11 at 2). From there, Defendant could have attempted to persuade the jury that the Government prematurely abandoned its investigation of Nisbett as the bank robber and erroneously pursued an investigation into Defendant instead. Thus—in addition to the development of an "other person" defense— defense counsel's investigation into Boyce's statement and the related VIPD and FBI investigation may have revealed information that would have allowed Defendant to argue a motive in support

of his claim that the GPS maps introduced by the Government were altered to indicate that Defendant was present at the Bank of St. Croix during the robbery.

The Court is not persuaded by the arguments to the contrary advanced by the Government. The Government relies heavily on its assertion that Defendant cannot demonstrate that pretrial disclosure of the exculpatory evidence would have allowed him to advance a trial strategy that would have put the case in a different light because of the "overwhelming evidence of Defendant's guilt" in the form of the GPS maps allegedly portraying Defendant's movements on the date of the robbery. (Dkt. No. 211 at 5-7). As discussed above, however, Defendant identified gaps in the Government's GPS evidence at trial—most notably, the absence of an explanation for the origin of the date and time stamps on three maps allegedly revealing Defendant's location at the time the robbery of the Bank of St. Croix occurred. Accordingly, given Defendant's identification of gaps in the critical GPS evidence and the absence of strong corroboration of that evidence at trial, the Courts finds that a "reasonable probability" exists that the jury's verdict may have been different had Defendant been able to present evidence of another possible perpetrator and further attack the reliability of the Government's investigation and evidence—including the GPS maps. *See Kyles*, 514 U.S. at 434. In other words, the Court concludes that, in the absence of the evidence suppressed by the Government, Defendant did not receive a fair trial so as to produce a "verdict worthy of confidence." *Id.*

The Government also asserts that because Nisbett was ruled out as a suspect in the investigation of the bank robbery after a review of the $1,800 discovered on Nisbett's person at the time of his arrest revealed no matches to the bills stolen from the Bank of St. Croix, any further activity in Nisbett's case—including the DEA 6 containing Boyce's statement—had no relevance to the investigation of the bank robbery. (Dkt. No. 188 at 2). The force of this argument is mitigated

19

by the evidence proffered by Defendant regarding anomalies in the chain of custody of the cash discovered on Nisbett's person—including his brother's alleged involvement in the handling of that cash—of which AUSA Andrews was aware.[9]

More importantly, however, the argument misconstrues the Government's obligations under *Brady*. As discussed above, the materiality prong of the *Brady* analysis does not rest on whether law enforcement considers a lead to be reliable or worth pursuing. Rather, "evidence is material under *Brady* when the defense could have used it to 'attack the reliability of the investigation,'" such that confidence in the outcome of the trial is undermined as a result of the withholding of the *Brady* material. *Dennis*, 834 F.3d at 308 (quoting *Kyles*, 514 U.S. at 446). Such is the case here.[10]

In sum, the Court concludes that, if the Government had made a pretrial disclosure of Boyce's statement regarding Nisbett's alleged connection to the Bank of St. Croix robbery, Defendant's counsel would have been "empowered [] to pursue strategies and preparations [s]he was otherwise unequipped to pursue." *Id.* Evidence suggesting that the bank robbery had been

---

[9] As discussed further below, during the evidentiary hearing AUSA Andrews acknowledged for the first time that he was aware that it would be impossible to conclude that the bills verified by law enforcement were the same bills in Nisbett's possession at the time of his arrest given the chain of custody issues. (Dkt. No. 242 at 229). AUSA Andrews attributed the Government's argument to the contrary in its filing to the more limited familiarity that AUSA Anna Vlasova—who drafted the Government's Response—had with the case.

[10] To the extent the Government argues that Boyce's statement is not material because it constitutes hearsay (Dkt. No. 211 at 5), the Court notes that Defendant is not required to demonstrate that Boyce's statement would have been admissible at trial where he can demonstrate that his knowledge of its existence would have permitted his counsel "to pursue strategies and preparations he was otherwise unequipped to pursue." *Dennis*, 834 F.3d at 308 (quoting *Kyles*, 514 U.S. at 446). Indeed, the Third Circuit affirmed in *Dennis* that "the admissibility of suppressed evidence ought not to change the materiality inquiry itself, which is understood as 'a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Id.* at 309 (quoting *Cone v. Bell*, 556 U.S. 449, 470 (2009)).

committed by Nisbett and his associates—which in turn may have led to the discovery of Nisbett's arrest, the dismissal of his criminal complaint, and the attendant circumstances—would have provided Defendant with a means of casting doubt on the thoroughness and integrity of the Government's investigation of this matter, as well as on the critical question of the reliability of the GPS maps introduced by the Government.

In view of the foregoing, the Court finds that the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Put another way, the Court finds that the suppressed evidence was material in that it creates a "'reasonable probability' of a different result"—thereby satisfying the third element in the *Brady* analysis. *See id.* at 434.[11] Accordingly, the Court concludes that Defendant has carried his burden of establishing that the Government committed a *Brady* violation when it failed to timely disclose material exculpatory evidence to Defendant—specifically, Boyce's statement that Nisbett and his associates were allegedly responsible for the bank robbery, as indicated in the September 16, 2014 DEA 6.

---

[11] The Government argues that Defendant can only show that the suppressed evidence undermines confidence in the jury's verdict if it demonstrates that Nisbett—as opposed to Defendant—"was the individual who jumped the counter during the robbery." (Dkt. No. 236 at 7). This assertion by the Government incorrectly describes the materiality inquiry and Defendant's burden at this stage. Because the Government carries the burden to prove Defendant's guilt beyond a reasonable doubt at trial, Defendant may demonstrate a reasonable probability that the outcome of his trial would have been different had Boyce's statement been disclosed to him if he can show that the evidence could have been used to effectively contest the Government's evidence and its theory of Defendant's guilt at trial, thus creating reasonable doubt. In view of the Government's burden at trial, Defendant is not required to affirmatively demonstrate that Nisbett—as opposed to Defendant—was the individual who jumped the counter during the robbery. *See Dennis*, 834 F.3d at 305 (explaining that "the jury would have had a reasonable doubt as to Dennis's guilt" had the inconsistent statements of an eyewitness contained in a police activity sheet been disclosed to his counsel); *see also Kyles*, 514 U.S. at 434-35 (explaining that the question of materiality for *Brady* purposes "is not a sufficiency of evidence test" and that "[t]he possibility of an acquittal on a criminal charge does not [necessarily] imply an insufficient evidentiary basis to convict")

## 2. Remedy for *Brady* Violation

Having determined that the Government committed a *Brady* violation by failing to disclose material exculpatory evidence to Defendant, the Court must now determine the proper remedy for the violation. As discussed above, retrial is normally the most severe sanction available for a *Brady* violation. In rare circumstances, dismissal of the indictment on due process grounds is "potentially available in cases [where a *Brady* violation was the product] of deliberate misconduct by the government which resulted in substantial prejudice to the defendant." *Jafari*, 2012 WL 5335242, at *2 (emphasis omitted) (citing *Fahie*, 419 F.3d at 254-55).

Willful misconduct by the government can be demonstrated either through evidence that the government knew it was required to disclose evidence but withheld it anyway (*i.e.*, evidence of the intentional withholding of exculpatory evidence), or through a showing that the government acted with reckless disregard for a defendant's due process rights in failing to disclose *Brady* material. *Fahie*, 419 F.3d at 256 ("[R]eckless misconduct, if prejudicial, may sometimes warrant dismissal. Otherwise, a prosecutor who sustains an erroneous view of her *Brady* obligations over time will be inadequately motivated to conform her understanding to the law.").[12] Dismissal of an

---

[12] In *Fahie*, the Third Circuit recognized that "a constitutional violation that results from a reckless disregard for a defendant's constitutional rights constitutes willful misconduct." *Id.* at 256 (citations omitted). Thus, where the prosecution fails to disclose *Brady* material as a result of its reckless disregard for its *Brady* obligations, dismissal of the indictment may be appropriate in light of the government's willful misconduct. Moreover, a defendant may establish that the prosecution acted with reckless disregard for the defendant's due process rights by "demonstrat[ing] a pattern of violations by which he can demonstrate reckless, and therefore willful, misconduct." *Id.* For example, the defendant in *Fahie* pointed to a "pattern of discovery abuse" by the prosecutor from which he attempted to demonstrate recklessness. Under the circumstances of that case, the Third Circuit concluded that the prosecutor's discovery violations supported a finding that "the prosecutor was at times disorganized, but not reckless[,]" and therefore concluded that dismissal of the indictment was inappropriate.

The Court also notes that while the Third Circuit's opinion in *Fahie* addressed allegations of reckless misconduct by an individual prosecutor, it quotes the Supreme Court's recognition in

indictment becomes available as a potential remedy in cases involving willful misconduct "because those cases call for penalties which are not only corrective but are also highly deterrent." *Id.* at 254-55. Defendant argues in favor of a finding of willful misconduct under both the intentional withholding and reckless misconduct theories.

### a. Intentional Withholding of *Brady* Material

In support of his contention that AUSA Andrews intentionally withheld *Brady* material, Defendant maintains:

> [I]t is clear that AUSA Andrews was personally and intimately aware of the fact that his confidential source[, Nisbett,] was being investigated by the FBI and the VIPD for the charge that AUSA Andrews brought and tried against Mr. Lang. The only conclusion that can be drawn is that AUSA Andrews intentionally suppressed what he actually knew was *Brady* material.

(Dkt. No. 177 at 13). Defendant points to the November 4, 2014 DEA 6 indicating that AUSA Andrews attended a proffer session on October 31, 2014, during which there was discussion of Nisbett's alleged connection to the Bank of St. Croix robbery, as evidence that AUSA Andrews was aware of the investigation into Nisbett's potential link to the bank robbery. Additionally, Defendant maintains that AUSA Andrews was "directly advised" by VIPD Captain Dino Herbert regarding an investigation that Captain Herbert was running into the alleged suspicious circumstances surrounding the seizure and comparison of the serial numbers on the cash discovered on Nisbett to those of the bills stolen from the Bank of St. Croix—thus further suggesting that AUSA Andrews was directly aware of the investigation into Nisbett's potential

---

*United States v. Morrison*, 449 U.S. 361 (1981), that—in the context of the violation of a defendant's Sixth Amendment right to counsel—a "pattern of recurring violations by investigative officers . . . might warrant the imposition of a more extreme remedy [than a new trial or suppression of the evidence] in order to deter further lawlessness." *Fahie*, 419 F.3d at 253 (quoting *Morrison*, 449 U.S. at 365 n.2). Thus, *Fahie* suggests that courts may consider the combined actions of Government agents in analyzing whether a pattern of violations demonstrating recklessness has occurred in a given case.

role in the bank robbery and undermining the Government's claim that Nisbett was eliminated as a suspect as a result of law enforcement's review of the seized cash. (Dkt. No. 205 at 3).

The Government failed to present any meaningful response in its filings to Defendant's allegations of willful misconduct, relying instead on its claim that no *Brady* violation occurred. In fact, despite a Court Order directing the Government to "specifically respond to the arguments made by Defendant . . . regarding whether the Government engaged in willful misconduct" and to "address the Government's position regarding remedies, in the event that the Court concludes that a *Brady* violation occurred" (Dkt. No. 208 at 1-2), the Government's supplemental memorandum filed in response did little more than repeat its previous arguments aimed at attempting to refute the existence of a *Brady* violation, with only a conclusory statement that any violation was not intentional (Dkt. No. 211 at 8). In light of the Government's failure to respond to Defendant's allegations of willful misconduct, the Court determined that an evidentiary hearing was necessary to address the issue of the proper remedy for the *Brady* violation in this case.

At the evidentiary hearing, AUSA Andrews acknowledged *for the first time* that he became aware of Boyce's interview with law enforcement and her statement regarding the bank robbery "[a]t some point after the interview, but in 2014[.]" (Evid. Hr'g. Gov't Exh. 10 at ¶ 6). AUSA Andrews explained that, after he learned about Boyce's statement, law enforcement received a tip that Defendant was responsible for the bank robbery and recovered the GPS tracking evidence that pointed to Defendant as the perpetrator. (Dkt. No. 242 at 82:20-83:17). He also asserted that Nisbett did not match the physical descriptions provided by witnesses of either of the two robbers at the bank. *Id.* at 83:18-25.

AUSA Andrews further stated that he learned "[s]ometime in 2014" that Boyce had partially recanted her statement regarding the assault that led to the arrests of Nisbett, Williams,

and Gordon. *Id.* at 84:1-9. He represented that Boyce claimed in her recantation that no gun had been involved in the incident and that she no longer wished to press assault charges. *Id.*[13] In light of the GPS tracking evidence implicating Defendant; the determination that Nisbett did not match the physical descriptions of the robbers in the bank; and Boyce's partial recantation, AUSA Andrews stated that "[a]s early as the end of 2014 the connection between Nisbett and the bank robbery was completely out of my mind." *Id.* at 85:3-5.

Although a copy of Boyce's statement was included in the Government's file in the Nisbett case because "it pertained to him," it was not included in the file in the instant case. *Id.* at 85:23-86:2. AUSA Rami Badawy was initially assigned to prosecute the bank robbery case, and the case was reassigned to AUSA Rhonda Williams-Henry in March 2016. *Id.* at 85:11-86-2. Because Boyce's statement was not included in Defendant's file, AUSA Andrews represented that he was the only person in the U.S. Attorney's Office with knowledge about the statement. *Id.* at 86:3-6. However, by the time he joined AUSA Williams-Henry in May 2016 to assist with preparations for the trial, AUSA Andrews represented that the "issue with Nisbett and the bank robbery had already gone out of my mind." *Id.* at 86:6-19. Boyce's statement was therefore not disclosed, although AUSA Andrews represented that there was "no conscious decision not to disclose it." *Id.* at 86:12-22.

While the Court credits AUSA Andrews' representation that the Government's failure to disclose Boyce's statement to Defendant was not the result of a conscious decision to withhold exculpatory evidence, the circumstances here are profoundly troubling. When stripped to its

---

[13] Boyce did *not*, however, recant her allegation that Nisbett, Williams, and Gordon were responsible for the robbery of the Bank of St. Croix in this later statement to law enforcement. (Dkt. No. 242 at 222:16-223:12). AUSA Andrews also acknowledged that he was aware that Boyce had stated in her prior interview with law enforcement that she was receiving threats and being pressured to drop the assault charges. *Id.* at 84:18-21.

essentials, the prosecution here was made aware of evidence that is clearly exculpatory to the defense, but neglected to include the evidence in the Government's bank robbery case file or to disclose it to Defendant as required by *Brady* because the prosecution failed to appreciate the value of that evidence to the defense as the Government's theory of the case shifted. Of particular significance in this regard is the Government's argument in its Response that because Nisbett had been ruled out as a suspect in the investigation of the bank robbery, Boyce's statement had no relevance for purposes of disclosure. (Dkt. No. 188 at 2). This misguided reasoning suggests, in the Court's view, a serious and fundamental misunderstanding by the Government of its obligations under *Brady*.[14] As the Third Circuit made clear in *Dennis*, "it cannot be that if the

---

[14] During the evidentiary hearing, AUSA Andrews articulated his own understanding of the Government's *Brady* obligations. He conceded that Boyce's statement constitutes information favorable to the defense which should have been turned over—a point that was never acknowledged in the Government's written filings on the issue—regardless of the Government's determination as to the evidentiary value of Boyce's assertions, although he maintained the Government's position that the evidence was not material for purposes of the determination of whether a *Brady* violation occurred here. (Dkt. No. 243 at 89:7-24). As described above, AUSA Andrews represented that the failure to disclose Boyce's statement was not the product of a deliberate choice to withhold evidence, but instead was a product of his failure to recall Boyce's statement at the time he assisted in trial preparations because he had completely dismissed the idea of Nisbett as a suspect in the bank robbery from his mind. (Dkt. No. 242 at 86:12-22).

Notwithstanding these assertions, the Court cannot ignore the representation made in the Government's Response, which raises a serious concern regarding the Government's understanding of its obligations under *Brady*. Additionally, although AUSA Andrews later clarified his understanding of the Government's *Brady* obligations during the evidentiary hearing, he initially stated that the Government "is not required to turn over information about alternate or other suspects when the information concerning that particular suspect is not plausible"—a determination that the Government itself would make. (Dkt. No. 242 at 62:15-22). While AUSA Andrews also represented that the Government generally turns over evidence "out of caution" even where the Government does not consider that evidence material to the defense, *id.* at 63:2-14, the dangers of an approach to *Brady* disclosures that is rooted in a prosecutor's assessment of evidentiary value—particularly where, as here, the evidence is exculpatory on its face—are clearly illustrated by this case. Indeed, it was because AUSA Andrews did not find Boyce's allegations plausible in light of other evidence in the case and thus dismissed them from his mind—in conjunction with the initial failure to make Boyce's statement a part of the file in the instant case—that resulted in AUSA Andrews' failure to recall Boyce's statement as preparations for trial were

Commonwealth fails to pursue a lead, or deems it fruitless, that it is absolved of its responsibility to turn over to defense counsel *Brady* material." *Dennis*, 834 F.3d at 306. The same applies here to any claim of "ruling out" Nisbett as a suspect by the Government. "The rationale behind *Brady* itself rests on the principle that prosecutors bear an obligation to structure a fair trial for defendants[.]" *Id.* (citing *Brady*, 373 U.S. at 87-88). "Structuring a fair trial for defendants demands that prosecutors freely disclose material that is helpful to the defense." *Id.* at 307. Accordingly, "making *Brady* disclosure depend on a prosecutor's own assessment of evidentiary value, as opposed to the benefit to defense counsel, is anathema to the goals of fairness and justice motivating *Brady*." *Id.* The Government's representation in its filings that the investigation into Nisbett was not relevant for purposes of disclosure because he was ruled out as a suspect by law enforcement thus represents an understanding by the Government of its *Brady* obligations that runs contrary to the law as established in the Third Circuit. *See id.*

Nonetheless, the Court credits AUSA Andrews' explanation of the circumstances surrounding the non-disclosure of the evidence, including his representation that the failure to disclose was not the product of a conscious decision to withhold exculpatory evidence on his part. Accordingly, the Court concludes that Defendant has not established that the Government's conduct—through AUSA Andrews—constitutes an intentional withholding of *Brady* material.

### b. Reckless Misconduct

As noted earlier, Boyce's statement that Nisbett, Williams, and Gordon were allegedly responsible for the robbery of the Bank of St. Croix was plainly exculpatory as to Defendant in that it suggested that individuals other than Defendant were responsible for the crime for which

---

underway and, ultimately, the Government's failure to disclose the exculpatory evidence to Defendant.

Defendant was charged and convicted. Given the obvious exculpatory value of Boyce's statement, the Court finds that AUSA Andrews—a seasoned prosecutor—acted with reckless disregard for the Government's obligations under *Brady* in failing to ensure that a copy of Boyce's statement was included in the Government's file in the bank robbery case.

Indeed, this failure by AUSA Andrews had serious consequences. As AUSA Andrews represented, he was the only person in the U.S. Attorney's Office with knowledge of Boyce's statement. Thus, when AUSA Badawy and subsequently AUSA Williams-Henry were assigned to prosecute the bank robbery case, they were unaware of Boyce's statement. By the time AUSA Andrews joined the prosecution team with AUSA Williams-Henry, Boyce's statement had long since "gone out of [his] mind" in light of AUSA Andrews' determination that Nisbett was not a viable suspect. AUSA Andrews' failure to place a copy of Boyce's statements in the bank robbery case file therefore set in motion a series of events that resulted in the failure to disclose plainly exculpatory evidence. AUSA Andrews' failure in this regard reflected a reckless disregard for the Government's obligations under *Brady*.

Although the Court's conclusion that AUSA Andrews' failure to disclose Boyce's statement was the result of his reckless disregard for the Government's *Brady* obligations is sufficient, standing alone, to establish willful misconduct on the part of the Government, *see Fahie*, 419 F.3d at 256 (recognizing that "a constitutional violation that results from a reckless disregard for a defendant's constitutional rights constitutes willful misconduct"), Defendant further argues that the Government engaged in a pattern of violations in this case "demonstrat[ing] reckless, and therefore willful, misconduct." *Id.* Defendant first attempts to show such a pattern by arguing that the suppression of the *Brady* materials should be considered alongside the alleged "prosecutorial misconduct forming the basis of [Defendant's] . . . pending motion for judgment of acquittal . . ."

(Dkt. No. 177 at 14). The alleged prosecutorial misconduct to which Defendant refers is his claim that the Government presented fraudulent evidence at trial by offering GPS maps that the Government knew were not authentic. (Dtk. No. 205 at 11).[15] Defendant contends that—if he were granted an opportunity to elicit testimony from Superior Court Deputy Marshal Chris Richardson at an evidentiary hearing—Deputy Marshal Richardson's testimony would demonstrate that he did not produce certain GPS maps that the Government presented as evidence of Defendant's movements on the date of the robbery of the Bank of St. Croix. (Dkt. No. 150 at 3).

The Court recently addressed Defendant's allegations regarding the authenticity of the GPS maps presented at trial—specifically, the three maps introduced as Government Exhibits 5B, 5C, and 5D—in the context of Defendant's Motion to Suppress and request for a *Franks* hearing in a separately-filed criminal case against Defendant on charges of unlawful possession of ammunition. (*United States v. Damian Lang, Sr.*, CRIM. ACTION NO. 2013-0015). In his Motion to Suppress, Defendant pointed to testimony from Jeffrey Keith, Deputy Marshal Richardson, and VIPD Detective Moses President during Defendant's trial in the instant case in support of his allegation that Detective President made false representations and omissions in his affidavit of probable cause in support of a search warrant for Defendant's residence, the execution of which ultimately led to the discovery of the ammunition that forms the basis of the charges in that case. Defendant asserted, *inter alia*, that Detective President had falsely represented in his affidavit that he had received GPS maps allegedly reflecting Defendant's movements on the date of the robbery of the Bank of St. Croix from the Office of the Superior Court Marshal, and that Detective President had

---

[15] While Defendant does not directly allege "prosecutorial misconduct" at any point in his Motion for Judgment of Acquittal, he does claim in his "Motion for Hearing Pursuant to Rules 33 and 59(e) [*sic*] of the Federal Rules of Criminal Procedure" ("Motion for Hearing") that the "Government [] present[ed] knowingly fraudulent evidence" in the form of altered GPS maps at trial. (Dkt. No. 150 at 2-3).

in fact fabricated the date and time stamps on the maps. (CRIM ACTION. NO. 2015-0013, Dkt. No. 254 at 13-14). The GPS maps challenged by Defendant as inauthentic in his Motion to Suppress are the same maps the Government introduced as Exhibits 5B, 5C, and 5D during Defendant's bank robbery trial.

In denying Defendant's Motion to Suppress and request for a *Franks* hearing, the Court made two findings that are pertinent to his allegation of prosecutorial misconduct here. First, the Court found that Defendant had failed to show through reference to Deputy Marshal Richardson's trial testimony that Deputy Marshal Richardson had *not* provided GPS maps to Detective President, as Defendant claimed. *Id.* at 23-24. In so ruling, the Court noted that although Defendant had identified an ambiguity in Deputy Marshal Richardson's testimony as to whether he had provided Detective President with "maps" or "coordinates," the existence of this ambiguity was not sufficient to satisfy Defendant's burden of making a substantial preliminary showing that Detective President knowingly made a false statement in his affidavit of probable cause. *Id.* at 24. The Court also noted that Defendant's cause was "further undermined by his failure to present an affidavit from Deputy Marshal Richardson affirming that he did not provide maps to Detective President." *Id.*

Second, with regard to Defendant's allegation that Detective President fabricated the date and time stamps on the GPS maps, the Court concluded that Defendant had failed to identify a sufficient factual basis in the record to support this theory. *Id.* at 27-28.[16] The Court found that

---

[16] Defendant's underlying theory was that Detective President borrowed a GPS ankle bracelet from the Office of the Superior Court Marshal; traveled the path Defendant allegedly took on September 2, 2014 in order that the borrowed GPS ankle bracelet would record those location coordinates; printed maps of the route Detective President *himself* took with the borrowed GPS ankle bracelet; labeled the maps reflecting Detective President's movements with the date September 2, 2014; and presented the maps as evidence of Defendant's involvement in the bank robbery. *Id.* at 27.

Defendant's theory was "largely the product of speculation built on the absence of an explanation at Defendant's bank robbery trial for the origin of the headings containing date and time stamps in the maps." *Id.* at 28. While the Court noted that Defendant had "identified a gap in the evidence presented by the Government at his bank robbery trial" that could "potentially [serve] as a means of casting doubt on the Government's evidence in the trial context," it concluded that—absent sufficient supporting facts in the existing record—Defendant's theory was inadequate to establish his entitlement to a *Franks* hearing. *Id.*

In light of the Court's findings in the context of ruling on his Motion to Suppress, the Court similarly concludes that Defendant has failed to demonstrate that the Government knowingly presented fraudulent evidence during his bank robbery trial. As noted above, Defendant relies on an assertion that Deputy Marshal Richardson would testify at an evidentiary hearing that he did not produce the GPS maps presented by the Government at the bank robbery trial in support of Defendant's allegation that the Government knowingly presented fraudulent evidence at the trial. Any such testimony by Deputy Marshal Richardson, however, would have been equally critical to Defendant's ability to establish that Deputy Marshal Richardson did not provide Detective President with the GPS maps in the context of Defendant's Motion to Suppress. Nonetheless, Defendant did not come forward with any compelling trial testimony or an affidavit from Deputy Marshal Richardson to this effect in support of his Motion to Suppress, and similarly has not done so in support of his claim of prosecutorial misconduct here. Accordingly, the Court finds that the arguments advanced by Defendant lack sufficient factual support to establish his claim that the Government engaged in prosecutorial misconduct by offering the GPS maps contained in Government Exhibits 5B, 5C, and 5D as evidence at Defendant's trial in this case.[17]

---

[17] The Court's conclusion that Defendant is unable to establish that the GPS maps were fabricated for purposes of demonstrating that the Government knowingly presented fraudulent evidence at

Of significant concern here, however, is the manner in which the Government responded after Defendant learned of Boyce's statement and filed his *Brady* Motion. Defendant contends that the Government has engaged in a pattern of violations demonstrating reckless disregard for his due process rights by presenting the Court with "unethically misleading" information in its Response to Defendant's Motion. Specifically, Defendant targets the Government's assertion in its Response—based on the FBI report bearing an entry date of October 3, 2014—that Boyce made no mention of Nisbett's possible connection to the Bank of St. Croix robbery when she was interviewed by FBI Special Agents Calhoon and Holtz in October 2014. (Dkt. No. 205 at 1-2, 4-5). This assertion gives the impression that the FBI—the agency responsible for the investigation into the bank robbery—knew nothing about Boyce's statement.

The Government conceded at the evidentiary hearing that this representation in its Response cannot be reconciled with the evidence before the Court.[18] The same FBI report to which

_____

trial does not affect the Court's determination regarding the materiality of Boyce's statement for *Brady* purposes. As noted above and in the Court's Memorandum Opinion denying Defendant's Motion to Suppress, the absence of an explanation at Defendant's bank robbery trial for the origin of the headings containing date and time stamps in Government Exhibits 5B, 5C, and 5D represents a gap in the evidence presented by the Government at trial. The disclosure of Boyce's statement—and information regarding Nisbett's arrest, the filing of a criminal complaint, and the subsequent dismissal of the complaint that an investigation by the defense into this evidence may have revealed—would have allowed Defendant's trial counsel to breathe life into her attack on the authenticity of the GPS maps in light of this unexplained gap in evidence critical to the Government's case. Accordingly, the Court's conclusion that Defendant cannot affirmatively establish that the GPS maps were fabricated or that the Government knowingly presented fraudulent evidence at trial does not alter its finding that there is a "reasonable probability" that the result of Defendant's trial would have been different had the exculpatory evidence been disclosed, and that absent the disclosure of the Boyce's statement Defendant did not "receive[] a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

[18] The Government maintains in its Response that DEA Special Agent Gardner was not present when FBI Special Agents Calhoon and Holtz interviewed Boyce in October 2014, and that the FBI report on the interview with Boyce does not indicate that she alleged that Nisbett was involved in the Bank of St. Croix robbery. (Dkt. No. 188 at 3). While the FBI report presented by the Government lists October 3, 2014 as its "Date of entry" and mentions neither the presence of DEA agents nor discussion of the bank robbery at the interview, the bottom of page one of the report

the Government points in its Response establishes that FBI Special Agents Calhoon and Holtz interviewed Boyce on September 10, 2014—the same date as the DEA interview. The September 16, 2014 DEA 6 confirms that FBI Special Agents Calhoon and Holtz were present with DEA Special Agent Gardner at Boyce's interview. Because the Government's Response was drafted by AUSA Anna Vlasova, who is no longer with the U.S. Attorney's Office in the Virgin Islands, AUSA Andrews stated at the hearing that he was simply unable to account for the rationale behind the representation in the Government's filing that FBI Special Agents Calhoon and Holtz did not participate in the interview in which Boyce alleged that Nisbett and his associates were involved in the Bank of St. Croix robbery. (Dkt. No. 242 at 208:8-215:25).[19]

---

contains the following notation: "Investigation on 09/10/2014 at Christiansted, Virgin Islands, United States (In Person). File # [redacted]. Date drafted 09/11/2014 by CALHOON THOMAS, Scott J. Holtz." (Dkt. No. 188-1). Thus, the FBI report the Government points to as evidence of an October 2014 interview of Boyce by FBI Special Agent Calhoon and Holtz is in fact a report drafted on September 11, 2014 and describing an interview conducted on September 10, 2014. The Government's assertion that the FBI and DEA interviews were two separate events is also impossible to reconcile with the following text from the September 16, 2014 DEA 6, in which Boyce's statement regarding the Bank of St. Croix robbery is contained: "On September 10, 2014, at approximately 2:00 p.m., Special Agent (SA) Tracey Gardner met with Federal Bureau of Investigation (FBI) Special Agents (SAs) Thomas Calhoun and Scott Holtz at the FBI office in St. Croix. Agents proceeded to interview Shakerah Boyce and Jose Osorio Jr. . . ." (Dkt. No. 177-1 at 11). The evidence before the Court therefore establishes—unmistakably—that DEA Special Agent Gardner and FBI Special Agents Calhoon and Holtz were all present for the same interview with Boyce on September 10, 2014, despite the absence of any mention in the FBI report of Boyce's statement regarding Nisbett's possible involvement in the bank robbery.

[19] During the evidentiary hearing, AUSA Williams-Henry represented that the reason AUSA Vlasova drafted the Government's Response was because both AUSA Williams-Henry and AUSA Andrews were preparing for trials in other matters at the time Defendant's *Brady* Motion was filed. (Dkt. No. 243 at 53:3-7). This does not, of course, explain why a document that is self-explanatory would be misconstrued by AUSA Vlasova in the way that it was. Nor does it explain why the U.S. Attorney's Office would allow allegations as serious as prosecutorial misconduct in the form of the alleged intentional withholding of *Brady* material to be briefed by an AUSA who lacks knowledge of the underlying facts, without even so much as a review of the submission prior to filing by a knowledgeable individual.

The above misrepresentation is not the only misstatement of the facts in the Government's Response. In support of the Government's contention that Nisbett's arrest "had no relevance" to the Bank of St. Croix robbery, the Response states:

> At the time of Nisbett's arrest, a large amount of currency was found on his body. Given that the arrest occurred short[l]y after the robbery of Bank of St. Croix, VIPD ran the serial numbers of the bills found on Nisbett's person during the arrest. VIPD were able to confirm that none of the numbers found on Nisbett's person matched the numbers of the bills that were taken from the Bank of St. Croix during the robbery. At this point, Nisbett was ruled out as a suspect of the robbery of the Bank of St. Croix, and any future activity in Nisbett's case has no relevance to the robbery of the Bank of St. Croix committed by Defendant.

(Dkt. No. 188 at 2 (internal emphasis omitted)).[20] In his Reply, Defendant contends that this representation by the Government is an additional attempt to intentionally mislead the Court. (Dkt. No. 205 at 2-3). Defendant asserts that AUSA Andrews was informed by VIPD Captain Herbert that Nisbett gave the cash discovered on his person at the time of his arrest to his brother—VIPD Officer Jeffrey Nisbett. Because Officer Nisbett did not turn the cash into the VIPD until the following day, there can be no guarantee that the bills he provided to the VIPD—and that law enforcement later checked against the serial numbers of the bills stolen from the Bank of St. Croix—were the same bills Officer Nisbett took from his brother. *Id.* at 3. Defendant thus argues that—given AUSA Andrews' awareness of the anomaly in the chain of custody with respect to the bills discovered on Nisbett's person—the Government's representation that Nisbett was ruled out

---

[20] Later in its Response, the Government again makes the same claim:

> The original investigative work done comparing the serial numbers of the bills found on Nisbett during his arrest in September 2014 yielded no matches to the bills that were stolen from the Bank of St. Croix during the robbery in in this matter. Any further investigative work conducted regarding Nisbett had no relevance to the robbery of the Bank of St. Croix that Defendant Lang was convicted of.

(Dkt. No. 188 at 7).

as a suspect as a result of law enforcement's comparison of the serial numbers is intentionally misleading. *Id.*

In his testimony at the evidentiary hearing, Captain Herbert confirmed that he informed AUSA Andrews on September 5, 2014 that Officer Nisbett had taken the currency discovered on Nisbett at the time of his arrest and had not turned the cash into the VIPD until the following day. (Dkt. No. 242 at 104:24-106:14). AUSA Andrews subsequently acknowledged at the hearing that he was aware of these circumstances surrounding the seizure of the cash from Nisbett. *Id.* at 227:19-228:15. AUSA Andrews stated that, as a result, it could not be said "with any certainty" that the bills Officer Nisbett turned into the VIPD were the same bills that were in Nisbett's possession at the time of his arrest. *Id.* at 229:8-16. Accordingly, AUSA Andrews agreed that the comparison of the serial numbers of those bills to the bills stolen from the Bank of St. Croix *could not* provide the basis for ruling Nisbett out as a suspect in the bank robbery, and stated that "in his mind" the serial number comparison was not the basis for ruling Nisbett out as a suspect. *Id.* at 229:17-23.

Once again, AUSA Andrews had no justification for the Government's contrary representation in its Response. All he was able to offer by way of explanation was that AUSA Vlasova—who drafted the Government's Response—was "not as familiar with the facts and the investigation" as AUSA Andrews was. *Id.* at 217:23-218:1.

In light of AUSA Andrews' acknowledgments at the evidentiary hearing, the Court finds that the Government's Response contains two false representations: (1) that FBI Special Agents Calhoon and Holtz were not present at the interview in which Boyce alleged that Nisbett and his associates were responsible for the robbery of the Bank of St. Croix; and (2) that Nisbett was ruled out as a suspect in the bank robbery as a result of law enforcement's comparison of the serial

numbers on the bills discovered on Nisbett at the time of his arrest to those on the bills stolen from the Bank of St. Croix.

The presence of these false representations in the Government's Response are troubling enough in their own right. Indeed, it goes without saying that the Government has an obligation to make a good faith effort to ensure the accuracy of the information contained in the filings it submits to the Court. Its apparent failure to adhere to that obligation here cannot be excused or justified by any claim that AUSA Vlasova had limited familiarity with the facts of the case. To the contrary, the Court finds that the Government's decision to place the sole responsibility of responding to Defendant's *Brady* Motion on an AUSA who was unfamiliar with the underlying facts—thereby resulting in the submission of a filing that contains false representations—demonstrates reckless disregard by the Government of Defendant's due process rights, and of the Government's obligations to this Court and the fair administration of justice in this case.[21]

The troubling conduct by the Government does not end with the false representations inexcusably included in the Government's Response. As noted above, in light of the disquieting allegations advanced by Defendant in his Motion and Reply and the absence of any response by the Government to Defendant's allegations of willful misconduct, the Court determined that supplemental briefing on the issue of the proper remedy for the *Brady* violation was necessary. The Court therefore ordered the Government to file a supplemental memorandum to (1) "specifically respond to the argument made by Defendant in his Motion and Reply regarding whether the Government engaged in willful misconduct, defined as either the intentional withholding of *Brady* materials, or reckless disregard for a defendant's rights"; and (2) "address

---

[21] Quite frankly, the Court is hard-pressed to understand how the possibility of a finding by the Court of willful misconduct by a prosecutor—given the critical role played by the prosecution in the fair administration of justice—could be taken so lightly.

the Government's position regarding remedies, in the event that the Court concludes that a *Brady* violation occurred in this case." (Dkt. No. 208 at 1-2).

The Government thus had an opportunity, through its supplemental memorandum, to correct the misrepresentations contained in its Response. It did not, however, take advantage of that opportunity.[22] Moreover, in addition to leaving the misrepresentations intact, the Government ignored the explicit directive in the Court's Order by failing to respond in any meaningful way to Defendant's allegations of willful misconduct. Instead, the Government's supplemental memorandum again referenced law enforcement's determination that Nisbett "was not a viable suspect" in support of its conclusory statement that "[t]here was nothing willful or intentional on the part of the government" with respect to the non-disclosure of Boyce's statement. (Dkt. No. 211 at 7-8).

During the subsequent evidentiary hearing, AUSA Williams-Henry—the attorney who drafted the Government's supplemental memorandum—represented that although she participated in the trial in this matter, she did not become aware of Boyce's statement until Defendant's *Brady* Motion was filed. (Dkt. No. 243 at 52:5-53:3). Because she was unfamiliar with the underlying circumstances, AUSA Williams-Henry asked AUSA Andrews to review the supplemental memorandum before it was filed with the Court. *Id.* at 50:23-51:13. Although AUSAs Andrews

---

[22] In fact, the Government represented once again in its supplemental memorandum that law enforcement had compared the serial numbers on the money found on Nisbett's person at the time of his arrest to the serial numbers of the money stolen from the Bank of St. Croix without finding any matches. (Dkt. No. 211 at 5). The Government did not, however, address Defendant's claim that AUSA Andrews was aware that the results of the serial number comparison were unreliable, nor did it respond to Defendant's allegation that the Government was attempting to mislead the Court through its representations about the serial number comparison. It was not until the evidentiary hearing that AUSA Andrews acknowledged for the first time that he was aware that the results of the serial number comparison could not provide the basis for ruling Nisbett out as a suspect in the bank robbery.

and Williams-Henry "talked about [the filing] a bit," AUSA Andrews allegedly did not have time to review the supplemental memorandum prior to the deadline for its submission because he was preparing for trial in another matter. *Id.* AUSA Williams-Henry acknowledged that the supplemental memorandum failed to address the issues identified in the Court's Order, but represented that—given time constraints—she decided to file the supplemental memorandum "instead of not responding to the Court's order[.]" *Id.*[23]

Here again, the Court finds the Government's attempt to explain its failure to respond to the Court's Order or to correct the misrepresentations in its Response by pointing to the AUSAs' otherwise demanding schedules to be utterly inadequate. By assigning the responsibility for drafting the Government's supplemental memorandum to an AUSA that was unfamiliar with the underlying circumstances—without any meaningful review of the filing by the AUSA with knowledge—the Government adopted the same misguided and unprincipled approach to the drafting of its supplemental memorandum as it took to the drafting of its initial Response to Defendant's *Brady* Motion. This approach resulted in the Government's failure to correct its prior false representations or to respond to the directives in the Court's Order. Even accepting that the Goverment's actions were not the result of an attempt to intentionally mislead the Court as to the underlying facts in this case, the Government's conduct here manifests an unquestionably cavalier and reckless attitude toward both this Court's Order and Defendant's serious allegation of a *Brady* violation.[24]

---

[23] It is unclear why a motion for an extension of time to respond—so as to allow additional time to address the specific directives in the Court's Order and to allow AUSA Andrews to review the filing—would not have been the obvious and more appropriate alternative.

[24] The fact that the Court ordered supplemental briefing by the Government, addressing whether the Government had engaged in willful misconduct and the remedies if the Court concluded that a *Brady* violation had occurred, should have alerted the Government that its position that no *Brady*

Under the circumstances here, the Court concludes that the Government engaged in "a pattern of violations" in this case that "demonstrate reckless, and therefore willful, misconduct." *Fahie*, 419 F.3d at 256. In addition to the underlying *Brady* violation itself—which the Court has already concluded was the result of the Government's reckless disregard for its obligations under *Brady*—the Government acted recklessly by twice assigning the responsibility to respond to Defendant's *Brady* Motion to AUSAs who were unfamiliar with the circumstances underlying the *Brady* violation allegations, without any meaningful review of the Government's filings by the AUSA with knowledge. This resulted in the submission of a Response that contained two significant representations of fact that the Government later acknowledged were false, and a supplemental memorandum that failed to correct the misrepresentations—and in fact continued to rely on one of them. When specifically ordered by the Court to respond to Defendant's allegations of willful misconduct and to address remedies if the Court found that a *Brady* violation occurred, the Government ignored the Court's directives in its supplemental memorandum. It was not until the Court conducted an evidentiary hearing—which it was forced to convene to obtain a responsive answer from the Government—that the Government, via AUSA Andrews, who from the outset was at the center of the controversy, responded to the allegations.[25] The Court finds that the Government's conduct in this case cannot be attributed to mere disorganization, inadvertence, or oversight. Instead, the actions of the AUSAs indicate to the Court that the Government failed to

---

violation occurred could be in jeopardy. Nonetheless, the Government proceeded undaunted, as if wholly indifferent to the Court's concerns.

[25] It appears that if the Court had not convened a hearing and personally questioned AUSA Andrews, the Government would not have come forth with a complete and accurate articulation of the underlying facts. Quite clearly, the Court should not be required to "pull teeth" in order to ensure a party's responsiveness. But such was the case here—a circumstance that is far below what this Court expects from litigants appearing before it, especially representatives of the United States.

take seriously its obligations under *Brady*, and to the Court, and that the Government acted with reckless disregard for Defendant's due process rights. Such conduct is plainly unacceptable.

In reaching this conclusion, the Court finds the decision of the district court in *United States v. Lashley*, 2011 WL 5237291, (E.D. Pa. Nov. 3, 2011), *aff'd*, 524 F. App'x 843 (3d Cir. 2013), to provide a useful comparator. In *Lashley*, the prosecutor committed a *Brady* violation by failing to disclose to the defendant—Stephen Lashley ("Lashley")—a copy of the plea agreement entered into by Jason Mack ("Mack"), a cooperating witness who testified at Lashley's trial. *Id.* at 1. The district court found that the prosecutor's failure to disclose the plea agreement had been inadvertent. *Id.* at *3.[26] Lashley argued, however, that the district court should find that the prosecutor engaged in willful misconduct because her "conduct before and during trial represent[ed] a 'pattern of recklessness.'" *Id.* Specifically, Lashley pointed to the prosecutor's statement at trial that "Mack was not looking to gain from his testimony" despite her knowledge of Mack's plea agreement, as evidence that the prosecutor engaged in a pattern of reckless misconduct. *Id.* at 5.

Although the district court found it "difficult to accept all of [the prosecutor's] excuses for what did or did not happen[] during the trial," it credited the prosecutor's testimony that she was not thinking about Mack's entitlement to a sentencing reduction when she made the offending statement at trial. *Id.* The district court therefore concluded that "her error—though a serious one— was inadvertent." *Id.* The district court also noted that "even if the statement were reckless," it was

---

[26] The district court found that the prosecutor had been "'disorganized, but not reckless' in failing to turn over the plea agreement." *Id.* at *5. The district court's finding in this regard was based on evidence that the prosecutor reasonably believed that she had in fact disclosed the plea agreement to the defense. *Id.* The district court also noted that the "government referenced the plea agreement in its original Trial Memorandum and later in its Sentencing Memorandum," and credited the prosecutor's testimony that "she did not realize she never turned over the plea agreement until it became an issue on appeal." *Id.*

insufficient alone "to represent the pattern of violations that *Fahie* requires to justify dismissal" given the district court's determination that the underlying *Brady* violation "resulted from disorganization, not recklessness." *Id.*

The district court also found significant the prosecutor's conduct after the issue of the *Brady* violation was raised on appeal. Once the prosecutor "realized her mistake she immediately consulted with her supervisors and together they decided to inform the Third Circuit of the error and to agree to a new trial." *Id.* Finally, noting the policy concern identified in *Fahie*, the district court found that there had been "no showing that [the prosecutor] was unaware of her obligations under *Brady*," and therefore concluded that this was not a case where dismissal was warranted to deter a prosecutor who "sustains an erroneous view of her *Brady* obligations over time[.]" *Id.* at *6 (quoting *Fahie*, 419 F.3d at 256.).

In contrast to the prosecutor's conduct in *Lashley*, the Court finds that the Government's conduct in the instant case demonstrates a pattern of recklessness. First, as discussed above, the underlying *Brady* violation itself indicates recklessness on the part of AUSA Andrews given the clearly exculpatory nature of Boyce's statement, which alleged that someone other than Defendant was responsible for the Bank of St. Croix robbery. Unlike in *Lashley*, there is no indication in this case that the Government believed it had disclosed the exculpatory evidence to Defendant. Defendant's counsel only became aware of the existence of Boyce's statement through defense counsel in another case after a verdict had been returned in Defendant's trial.

Second, far from acknowledging its mistake as did the prosecutor in *Lashley*, the Government vehemently denied that a *Brady* violation occurred here. Indeed, it was not until he appeared for the evidentiary hearing on November 20, 2018—which the Court felt compelled to convene after abject unresponsiveness from the Government—that AUSA Andrews

acknowledged *for the first time* that he was made aware of Boyce's statement sometime in 2014, and that the statement should in fact have been disclosed to Defendant. Rather than responding to Defendant's allegation of a *Brady* violation with the attention and concern it merited, the Government assigned the responsibility to respond to Defendant's *Brady* Motion to an AUSA who was unfamiliar with the matter at hand, and who therefore included false representations in the Government's Response. When specifically ordered by the Court to address Defendant's allegations of willful misconduct, the Government again assigned the task of drafting its supplemental memorandum to an AUSA who was unfamiliar with the underlying facts. Although the Government recognized the need for review of the submission by the AUSA with knowledge of the underlying circumstances, the supplemental memorandum was submitted without any such review, resulting in the Government's failure to correct its false representations and to respond to the Court's directives. The Court thus finds that the Government engaged in a pattern of reckless behavior that demonstrates a disregard for Defendant's due process rights.[27]

Third, as detailed above, the substance of the Government's arguments in its filings—and specifically, its repeated assertion that there was no need to disclose Boyce's statement to Defendant in light of law enforcement's decision to rule Nisbett out as a suspect in the bank robbery—suggests to the Court that the Government maintains an erroneous view of its *Brady* obligations. The Government's pattern of recklessness thus arises in a context in which dismissal

---

[27] By citing to the facts of *Lashley*, the Court is not suggesting that the Government was required to forfeit its argument that there was no *Brady* violation because the evidence was not material. The Court *is* maintaining, however, that it expects that the Government would have conducted a thorough review of the facts; made accurate representations to the Court; corrected any misrepresentations at the earliest opportunity; and responded to the specific inquiries set forth in the Court's Order—none of which the Government did until forced to do so at an evidentiary hearing.

of the indictment is supported by the policy concern identified in *Fahie* of deterring future *Brady* violations.

Our nation's system of justice relies on prosecutors to understand and faithfully comply with their disclosure obligations to ensure that defendants are afforded a fair trial and that justice is served. *See Dickson v. Quarterman*, 462 F.3d 470, 479 (5th Cir. 2006) ("The duty of a prosecutor, as the representative of the sovereign in a criminal case, is 'not that it shall win a case, but that justice shall be done.' . . . Accordingly, a prosecutor faithfully discharges his duty where he fully understands his obligations under *Brady*, not where . . . he fails to 'consciously th[ink] about it one way or the other.'") (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)); *see also Kyles*, 514 U.S. at 439 ("Unless . . . the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when the suppression of evidence has come to portend such an effect on a trial's outcome as to destroy confidence in its result."). "Indeed, the preservation of our civil liberties depends upon the faithful and ethical exercise of power by those who bear the mantle of public trust." *Dickson*, 462 F.3d at 479 (citing *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 386 (2004)). Far from a "faithful and ethical exercise of [governmental] power," *id.*, the Government's conduct in this case—both in its reckless disregard for its *Brady* obligations through its failure to disclose clearly exculpatory evidence to Defendant and in its reckless approach to its responses to Defendant's *Brady* allegations—demonstrates an abject indifference by the Government to Defendant's due process rights, its obligations to the Court, and its role in the fair administration of justice.

### 3.    Prejudice

In *Fahie*, the Third Circuit established that the prejudice a defendant must demonstrate to establish a *Brady* violation and the prejudice a defendant must demonstrate to establish that dismissal of the indictment is a proper remedy for that violation are separate and distinct. *See Fahie*, 419 F.3d at 256 n.10 ("In order to find a *Brady* violation in the first place, a court must find that some prejudice ensued to the defendant. . . . Only if a defendant has demonstrated that his rights were violated and that the violation was willful need a court again consider the degree of prejudice in fashioning an appropriate remedy.") (internal citation omitted). Accordingly, the Court must now consider the degree of prejudice suffered by Defendant to determine whether dismissal of the indictment is an appropriate remedy in light of the Government's willful misconduct.

Defendant presents a series of arguments in support of his contention that the prejudice resulting from the Government's *Brady* violation is of a sufficiently serious degree to warrant dismissal of the indictment. First, Defendant argues that, in order to contest the Government's position that Boyce's statement was not material under *Brady*, Defendant was forced to lay out his "other person" theory and reveal how he would present this argument at a retrial through his filings in support of his *Brady* Motion. He contends that because the Government is now privy to the defense theory that he would advance at a retrial, the Government would hold an unfair advantage were the Court to order a new trial as opposed to dismissing the indictment. (Dkt. No. 243 at 118, 123).

Second, Defendant notes that four-and-one-half years have passed since the September 2, 2014 robbery of the Bank of St. Croix occurred; that nearly three years have passed since Defendant's trial; and that nearly two years have passed since Defendant filed his *Brady* Motion

on May 8, 2017. He argues that his ability to locate and contact Boyce and other witnesses has been seriously impaired by this passage of time. *Id.* at 119. Defendant also argues that it is unclear whether other evidence that could support his "other person" defense—including the receipts and phone found on Nisbett's person at the time of his arrest, the photographs on Nisbett's phone showing a weapon in the hotel room where Nisbett was staying at the time he was arrested, and evidence collected by Captain Herbert during his investigation into the handling of the cash discovered on Nisbett's person at the time of his arrest—still exists and is available for use at trial given the amount of time that has passed. *Id.* Third, Defendant argues that the Government bears responsibility for the delay in the resolution of Defendant's *Brady* Motion—and hence the delay in a new trial, if ordered—because of the approach it took in responding to his *Brady* allegations. *Id.* at 121-22.

The Court finds Defendant's arguments compelling.[28] As discussed above, the utility of Boyce's statement to the defense—had it been disclosed—was largely tied to the investigative activities that defense counsel could have undertaken to develop and advance an "other person" defense at trial and to cast doubt on the thoroughness and integrity of the Government's investigation into the bank robbery. Given the passage of four-and-one-half years since the bank robbery occurred, it is unlikely that the strategies and preparations defense counsel could have pursued had Boyce's statement been timely disclosed are still available. Even if defense counsel were able to locate Boyce, the effect of the passage of time on witness memories and investigatory leads would undoubtedly impact the reliability and usefulness of any information she might provide. *See Doggett v. United States*, 505 U.S. 647, 654 (1992) (noting in the context of a speedy

---

[28] The Government fails to present any meaningful response to Defendant's arguments that the prejudice he incurred as a result of the *Brady* violation warrants dismissal of the indictment.

trial claim that "the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence" is "the most serious" type of prejudice "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.") (quotations and internal quotation marks omitted). The same holds true for evidence related to Nisbett's arrest and the attendant circumstances. Further, Defendant rightfully points out that were he to present an "other person" defense mirroring the theory he has laid out in support of his *Brady* Motion based on evidence uncovered after his trial, the Government would be advantaged at retrial by its insight into Defendant's theory and strategy. In light of these circumstances, the Court sees no remedies—and the Government has suggested none—that would permit Defendant an opportunity for a fair retrial that would result in a verdict worthy of confidence.[29]

Accordingly, having concluded that the Government engaged in willful misconduct and that the degree of prejudice to Defendant resulting from the Government's *Brady* violation justifies dismissal of the indictment, the Court will dismiss the indictment against Defendant with prejudice.

---

[29] Certainly, there were delays in this case that were not occasioned by the Government. Nonetheless—while the Government does not bear the sole responsibility for delays that have occurred over the course of the proceedings in this matter—the Government's reckless approach in responding to Defendant's *Brady* allegations through its inclusion of misrepresentations of fact in its filings, and its failure to meaningfully answer Defendant's allegations of willful misconduct despite explicit directives by the Court, had a significant impact on the Court's ability to resolve Defendant's *Brady* Motion more expeditiously. Although not determinative, the Court finds that the Government's conduct in producing the delay in the resolution of Defendant's *Brady* Motion is relevant to the Court's determination as to the proper remedy for the *Brady* violation in this case. *See, e.g., United States v. Benjamin*, 816 F. Supp. 373, 381 (D.V.I. 1993) (finding in the speedy trial context that dismissal of the indictment was the appropriate remedy for delays attributable to the government where "actual prejudice [wa]s sufficiently proved and [the government's] negligence [] resulted in unreasonable delay not persuasively rebutted").

### III.    CONCLUSION

For the reasons set forth above, the Court concludes that the Government committed a *Brady* violation by failing to disclose material exculpatory evidence to Defendant. The Court further finds that the Government's *Brady* violation was the product of willful misconduct—as established, both individually and collectively, by the Government's reckless failure to disclose clearly exculpatory evidence to Defendant and the pattern of violations in this case demonstrating a reckless disregard for Defendant's due process rights. Finally, the Court finds that the degree of prejudice resulting to Defendant from the Government's *Brady* violation is sufficiently severe to warrant the dismissal of the indictment. Accordingly, the Court will grant Defendant's *Brady* Motion and will dismiss the indictment in this case with prejudice.[30]

An appropriate Order accompanies this Memorandum Opinion.

Date:   April 17, 2019

_____/s/_____
WILMA A. LEWIS
Chief Judge

---

[30] In light of the Court's ruling on Defendant's *Brady* Motion and its dismissal of the indictment, Defendant's Motion for Judgment of Acquittal (Dkt. No. 132) and related motions will be denied as moot.